## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| LONALD W. HEEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  09-3184 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

CHARLES H. EVANS, U.S. Magistrate Judge:

Plaintiff Lonald W. Heeman appeals from a final decision of the Social Security Administration (SSA) denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416, 423, and 1381a.  Plaintiff brings this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  The parties have consented to a determination of this case by the United States Magistrate Judge, under 28 U.S.C. § 636.  <u>Consent to Proceed Before a United States Magistrate (d/e 7)</u>.  Pursuant to Local Rule 8.1(D), Plainitff has filed a Brief in Support of Complaint (d/e 11), which

1

the Court construes as a motion for summary judgment.  The Commissioner has filed a Motion for Summary Affirmance (d/e 13) and Commissioner's Memorandum in Support of Motion for Summary Affirmance (d/e 14).

For the reasons set forth below, the Court determines that the SSA's decision is supported by the law and the evidence.  Plaintiff's motion for summary judgment is DENIED.  The Commissioner's Motion for Summary Affirmance is GRANTED, and the decision of the Commissioner is AFFIRMED.

STANDARDS

Judicial review of the Commissioner's final determination of disability is limited, and the Commissioner's findings of fact are treated as conclusive as long as they are supported by substantial evidence.  42 U.S.C. § 405(g); Halbrook v. Chater, 925 F. Supp. 563, 571 (N.D. Ill. 1996).  "Substantial evidence" means evidence that "a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971); Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000).  On review, courts may not reevaluate evidence, make new factual determinations, or substitute their judgment for that of the Commissioner.  Powers, 207 F.3d at 434-35.

Nonetheless, the Court must look to the record as a whole to

determine if there is "substantial evidence" supporting the ALJ's decision. <u>Stephens v. Heckler</u>, 766 F.2d 284, 287 (7th Cir. 1985). An ALJ's opinion need not evaluate "every piece of testimony and evidence submitted." <u>Zalewski v. Heckler</u>, 760 F.2d 160, 166 (7th Cir. 1985). All that is required is that the ALJ "considered the important evidence" in the opinion, thus allowing the Court to "trace the path of the ALJ's reasoning." <u>Stephens</u>, 766 F.2d at 287.

In determining whether an individual is disabled for Social Security purposes, the ALJ must use the five-step sequence outlined in 20 C.F.R. § 404.1520(a). Each step must be satisfied before moving on to the next step. First, the ALJ determines if the claimant engages in "substantial gainful activity," (SGA) defined as work that involves significant physical or mental activities, usually done for pay or profit. 20 C.F.R. § 416.920(b). If the claimant is not involved in SGA, step two requires the ALJ to decide whether the claimant has a medically determinable impairment that is "severe," or a combination of impairments that, taken together, are "severe." 20 C.F.R. § 416.920(c). Severity is measured by whether an impairment significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 416.921; SSRs 85-28, 96-3p, 96-4p. If such an impairment is

3

found, the ALJ proceeds to step three.

In step three, the ALJ evaluates whether the claimant's impairment meets criteria listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the Listings). If the ALJ decides in the affirmative, the claimant is disabled. If the claimant's condition is not equivalent to a Listing, the ALJ moves on to step four. Step four requires the ALJ to determine the claimant's residual functional capacity (RFC). The ALJ considers all impairments, not just those found to be severe under step two. 20 C.F.R. § 416.945. The ALJ then determines whether the claimant has the RFC to perform past relevant work.

If the claimant is not able to perform past relevant work, the ALJ moves to step five, where he evaluates whether the claimant is capable of performing other work. 20 C.F.R. § 416.920(g). The ALJ takes into consideration the claimant's RFC, age, education, and work experience. At this juncture, the SSA is responsible for producing evidence that demonstrates that there is work suitable for the claimant in the national economy. 20 C.F.R. §§ 416.912(g), 416.960(c). If the ALJ determines that there is other work available to the claimant, the claimant is not disabled for purposes of SSI or DIB.

4

3:09-cv-03184-CHE  # 16  Page 5 of 31

FACTS

I.      PERSONAL & MEDICAL HISTORY

At the time of the administrative hearing, Plaintiff was a forty-three-year-old male who lived in Meredosia, Illinois, with his wife and fifteen-year-old daughter.  Answer (d/e 9), Exs. 1-14, Social Security Transcript (Tr.), 673-74.  In July 2001, Plaintiff was hospitalized after he hurt his back and neck while stepping off of a pallet at work.  Tr. at 176.  The treating physician noted that Plaintiff had a history of back pain, and prescribed him medication and ordered work restrictions until Plaintiff could follow up with his regular physician.  Tr. at 176.  Plaintiff received some physical therapy for his injuries, but as of September 25, 2001, still experienced back pain.  Tr. at 166.  On October 2, 2001, Plaintiff went back to the hospital with back pain.  The treating physician ordered more medication and ordered Plaintiff to see a neurologist.  Tr. at 173-74.

Plaintiff continued to have back pain throughout the fall of 2001.  In late October, Plaintiff had an epidural injection to help manage his pain.  Tr. at 329.  He followed up with Dr. Marshall Robert on November 7, 2001, seeking different methods of pain management and another round of physical therapy.  Tr. at 328.  Dr. Robert indicated that Plaintiff had a

5

herniated nucleus pulposis and spondylolisthesis.  <u>Tr.</u> at 328.   On November 21, 2001, Plaintiff again saw Dr. Robert.  Dr. Robert indicated that Oxycontin was helping Plaintiff with his pain, but Plaintiff complained that his employer was not adhering to the functional restrictions imposed by Plaintiff's physicians.  <u>Tr.</u> at 327. On November 26, 2001, Dr. Robert confirmed that he would issue a written work-restriction order, limiting Plaintiff to carrying no more than ten pounds.  <u>Tr.</u> at 327.  Dr. Robert received a more comprehensive list of restrictions from a Dr. Holt[1] on December 7, 2001, limiting Plaintiff to carrying no more than ten pounds, sitting at least fifty percent of the time, infrequent bending, and ordering time off for physical therapy sessions.  <u>Tr.</u> at 326.

On December 28, 2001, Dr. Barry Samson examined Plaintiff and diagnosed him with degenerative disc disease and spondylolisthesis.  <u>Tr.</u> at 363.   Dr. Samson believed that Plaintiff's injury in July 2001 had exacerbated preexisting conditions, and noted that Plaintiff's options were to attend physical therapy sessions, undergo further testing, or live with the pain.  <u>Tr.</u> at 363.  In February 2002, Plaintiff began seeing Cathy Wilson,

---

[1]As the Commissioner points out, the Transcript does not contain any treatment records from Dr. Holt.

a physical therapist.  Tr. at 298-300.  Plaintiff attended several therapy sessions during February 2002, but complained that his back pain was severe.  Tr. at 299.

Plaintiff also continued to see Dr. Robert throughout 2002.  In August 2002, Dr. Robert indicated that Plaintiff had obtained a job washing dishes at a restaurant, but that the work made Plaintiff's extremities go numb and caused his neck pain to flare up.  Tr. at 318.  Dr. Robert noted that Plaintiff was still having pain, despite his physical therapy and medications.  Tr. at 315.  On December 3, 2002, an MRI revealed that Plaintiff had two herniated discs.  Tr. at 315.  In January 2003, Plaintiff told Dr. Robert that the Vicodin was not alleviating his pain, and that his job washing dishes was making his back pain worse.  Tr. at 314.  Legal troubles made it difficult for Plaintiff to afford his medication.  Tr. at 313.

In February 2003, Dr. Robert again ordered physical therapy for Plaintiff.  Tr. at 313.  The Vicodin was still not alleviating Plaintiff's pain, but on April 4, 2003, Dr. Robert noted that he had referred Plaintiff to Dr. Claude Fortin for further treatment.  Tr. at 312.  Dr. Fortin performed a neurological evaluation on Plaintiff in April 2003, and prescribed medication to help with Plaintiffs recurring lower back pain.  However, Dr.

Fortin noted a "paucity of objective findings . . . other than lumbar paraspinal muscle spasms." <u>Tr.</u> at 188.  In June and July 2003, Dr. Fortin performed a nerve root block and gave Plaintiff steroid injections.  <u>Tr.</u> at 192-95.  Dr. Fortin did another steroid injection in August.  <u>Tr.</u> at 190-91. Dr. Fortin indicated that Plaintiff's lower back pain had "significantly improved" after the injections.  <u>Tr.</u> at 184.  A September 2003 progress note from Dr. Robert indicated that Plaintiff's steroid injection treatments had been largely successful, and that Plaintiff was more functional, although not pain free.  <u>Tr.</u> at 310.  Dr. Robert indicated that Plaintiff was anxious about his legal situation.  <u>Tr.</u> at 310.

On November 5, 2003, Dr. Robert wrote a letter stating that Plaintiff had been "medically disabled and in chronic pain from a back injury at work" for nearly two years, and noting that various treatments for pain had been unsuccessful.  <u>Tr.</u> at 558.  Dr. Robert wrote that specialists indicated that Plaintiff would always be in pain and would "have some stringent physical restrictions that will affect his employability." <u>Tr.</u> at 558.  Dr. Robert did not indicate what those restrictions would be.  Plaintiff continued to see Dr. Robert throughout 2003 and into 2004, but his pain only worsened.  Plaintiff visited the emergency room with back pain in

December 2003 and March 2004.  Tr. at 232-41.

Plaintiff once again began physical therapy in March 2004, but continued to complain of lower back pain.  Tr. at 164.  He received another steroid injection in March 2004, and expressed some pain relief afterwards.  Tr. at 232-35.  An MRI from April 2004 indicated some degenerative disc disease, but no spinal stenosis, enhancing pathology, or frank disc herniation.  Tr. at 172.  An examining physician indicated on May 6, 2004, that Plaintiff engaged in "somewhat exaggerated pain behaviors with moaning and groaning upon arising from a chair."  Tr. at 179.

On June 9, 2004, Dr. Koteswara Narla performed a neurological evaluation on Plaintiff.  Tr. at 213-15.  Dr. Narla diagnosed Plaintiff with failed back syndrome "with an MRI scan showing very little pathology with the lumbar pain and right-sided radiculopathic symptomatology."  Tr. at 214.  Dr. Narla wanted Plaintiff to continue on Methadone, and suggested a spinal stimulator as a potential treatment.  Tr. at 214.  In October 2004, Dr. Narla indicated that medication treatment had been unsuccessful, and that the only thing left to try was a spinal stimulator.  Dr. Narla also suggested that Plaintiff see a psychiatrist to help with his depression.  Tr. at 337-38.  A progress note from December 11, 2004, indicated that the trial

with the spinal stimulator was unsuccessful, and the device was removed. Tr. at 207-10.

On May 24, 2005, Plaintiff saw Dr. Richard Kujoth, a clinical psychologist, for a psychological evaluation.  Tr. at 367-74.  Plaintiff expressed suicidal thoughts.  Dr. Kujoth noted that Plaintiff could perform one- or two-step tasks, but that he would have difficulty concentrating because of his back pain.  Tr. at 373.  Dr. Kujoth diagnosed Plaintiff with pain disorder and depressive disorder.  Tr. at 373.

In June 2005, Dr. Marion Panepinto performed a physical RFC assessment on Plaintiff on behalf of the state agency.  Tr. at 383-90.  Dr. Panepinto found that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and stand or walk for six hours during an eight-hour work day.  Tr. at 384.  He also noted that Plaintiff could sit for six hours during an eight-hour work day, and that his ability to push and pull was unlimited.  Tr. at 384.  Plaintiff could occasionally climb stairs, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds. He could frequently balance, though.  Tr. at 385.  Plaintiff had no environmental or manipulative limitations.

Also in June 2005, Dr. Lionel Hudspeth performed a psychiatric

review technique on Plaintiff.  Tr. at 391.  Dr. Hudspeth found that there were indications of an affective disorder under Listing 12.04 because of Plaintiff's symptoms of depression.  Tr. at 394.  However, Plaintiff did not satisfy any of the Paragraph B criteria because he only had mild restrictions in activities of daily living and difficulties maintaining social functioning. Tr. at 401.  While his difficulties in maintaining concentration, persistence, or pace were moderate, he had experienced no periods of decompensation. Tr. at 401.  Nor did Plaintiff satisfy the Paragraph C criteria.  Tr. at 402. Dr. Hudspeth attributed any difficulties Plaintiff had with concentration to his lower back pain, and indicated that there was "no evidence of psychosis."  Tr. at 403.

Plaintiff continued to see Dr. Narla.  On July 15, 2005, Plaintiff complained of pain in his lower back and right leg.  He rated the pain a seven on a ten-point scale.  Tr. at 375.  Dr. Narla recommended that Plaintiff continue taking his medication and return for a follow up visit in six months.  However, Plaintiff returned on October 31, 2005, and Dr. Narla prescribed him larger dosages of his pain medication.  Tr. at 430.  Dr. Narla noted that Plaintiff was not a candidate for surgical intervention.  Tr. at 430.  He also indicated that a steroid injection would not be useful, as

previous attempts had not been beneficial.  Tr. at 430.

In August 2005, Plaintiff saw Robert Heape, a licensed clinical professional counselor.  Plaintiff told Heape that he frequently thought about suicide, and that he was in pain all the time.  Tr. at 419.  Plaintiff was embarrassed by the fact that he had been unable to work for four years.  Plaintiff admitted that he was an alcoholic, but noted that he had been sober for several years.  Tr. at 420.  Heape concluded that Plaintiff "seem[ed] to meet the criteria for Major Depression . . . ."  Tr. at 424.

Plaintiff visited Dr. Narla again on March 31, 2006, complaining of pain rating a seven to ten on a ten-point scale.  Tr. at 433.  Dr. Narla indicated that Plaintiff had been seeing Dr. Brad Hughes, a psychiatrist, for symptoms of depression.  Tr. at 433.  Dr. Narla wrote that he told Plaintiff that he would not be ordering prescriptions for him due to Plaintiff's depression and concerns about suicide attempts.  Dr. Narla told Plaintiff that there was "very little else" he could do for him, other than treat him with non-steroidal anti-inflammatory drugs.  Tr. at 433.

On July 24, 2006, Heape put together an individual treatment plan for Plaintiff.  Tr. at 451.  Heape diagnosed Plaintiff with major depression that was recurrent and severe, back and neck injuries, chronic pain, and

financial instability.  Tr. at 451.  Plaintiff saw Heape regularly, and told Heape that he was cutting himself.  See, e.g., Tr. at 466.  While Plaintiff complained of suicidal ideation, Heape did not indicate that Plaintiff seemed suicidal, and there is no evidence of suicide attempts in the record. Plaintiff continued his therapy into 2007, and seemed to have stopped cutting himself, noting that the therapy sessions were helping him.

Plaintiff also saw Dr. Hughes for medication management starting in 2007.  Tr. at 565, 567-68, 571-72.  Dr. Hughes downgraded Plaintiff's diagnosis from severe stress to moderate stress.  Tr. at 614.  On January 3, 2008, Plaintiff told Dr. Hughes that he was doing well, and that he was looking forward to the birth of his grandchild.  Tr. at 614.  Plaintiff stated that he still felt sad sometimes, though.

In July 2007, Plaintiff visited Dr. Robert again, seeking a referral to a pain-management specialist.  Tr. at 538-40.  Plaintiff told Dr. Robert that he had waited for more than a year for an appointment with Dr. Fortin, but that Dr. Fortin had declined to see him again after reviewing Plaintiff's medical records.  Tr. at 540.  In August 2007, Plaintiff went to the emergency room twice because of lower back pain.  Tr. at 599-604.  Later, in the fall of 2007, Plaintiff returned to Dr. Robert, who gave Plaintiff pain

medication.  <u>Tr.</u> at 532, 536-37.

II.    <u>PROCEDURAL HISTORY</u>

Plaintiff applied for DIB and SSI on September 30, 2004, alleging an onset date of July 18, 2001.  The SSA denied his application initially and upon reconsideration.  On October 26, 2005, Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ).  The hearing took place on February 5, 2008, via video-conference, with Plaintiff and vocational expert Dr. James Lanier in Springfield, Illinois, and the ALJ presiding from Peoria, Illinois.  <u>Tr.</u> at 671.

Plaintiff testified at the hearing.  He stated that his wife drove him to the hearing, and that they had to make two stops during the one-hour drive.  <u>Tr.</u> at 675.  During the hearing, Plaintiff asked if he could stand up.  <u>Tr.</u> at 677-78.  He stated that the last time he had worked was in December 2001, when he worked at a grocery store doing light duty.  <u>Tr.</u> at 679.  Plaintiff was sometimes confused during his testimony, and noted that he had been put on a new medication the previous day.  <u>Tr.</u> at 680.  He testified that some of the side effects from his medication were drowsiness and dizziness.  <u>Tr.</u> at 680-81.

Plaintiff indicated that he was unable to lift more than ten pounds at

a time, and that he could not do tasks like rake his yard.  <u>Tr.</u> at 683.  He stated that he had trouble bending.  Plaintiff also noted that his depression had made him cut himself, and that he did not like to be around other people.  <u>Tr.</u> at 684.  Plaintiff testified that he could manage his own personal hygiene fairly well, but that he could only go about an hour or an hour and a half without having to lie down.  <u>Tr.</u> at 689.  He stated that he had no hobbies and did no household chores, beyond helping to fold laundry.  <u>Tr.</u> at 689-90.  Plaintiff testified that he watched television and lay on the couch for five to six hours per day.  <u>Tr.</u> at 691.  Occasionally, Plaintiff picked up his children from school.

With respect to his lower back pain, Plaintiff stated that the only relief he could find was lying down in a specific position.  The four steroid injections he received had not been helpful, and the lower back pain also made his leg hurt.  <u>Tr.</u> at 694-95.  Additionally, Plaintiff's neck pain caused his arms and fingers to go numb at times.  Plaintiff also indicated that he had been diagnosed with chronic obstructive pulmonary disease.  <u>Tr.</u> at 696. Plaintiff stated that he had suicidal thoughts every day, and that he would cry roughly three times a week.  <u>Tr.</u> at 696-98.  Plaintiff noted that he had difficulty concentrating because of the pain, and that he did not read books

for that reason.  Tr. at 700.  Plaintiff said that on an average day, his pain was an eight on a ten-point scale, and that on a good day, it was a six.  Tr. at 702.  He stated that he had about five good days per month.

Vocational expert Dr. James Lanier also testified at the hearing.  The ALJ asked Dr. Lanier to consider an individual with the same age, education, and work experience as Plaintiff, who was limited to light work and could not be around ropes, ladders, or scaffolds.  Tr. at 704.  The individual had occasional postural limitations and was limited to moderately complex tasks and occasional interaction with co-workers and the public.  Dr. Lanier testified that such an individual could perform the job of fertilizer mixer, which involved frequent reaching and handling.  Tr. at 704-05.  If the hypothetical was modified to a sedentary position with "a sit/stand option," the individual could be a surveillance system monitor, ampule sealer, and lens glass assembler.  Dr. Lanier testified that these jobs existed in the Illinois economy, and that this individual could still perform these jobs even if he was unskilled.  Tr. at 705.  However, if the individual missed four or more days of work per month, that individual would be terminated.  Tr. at 705.

Plaintiff's attorney and Dr. Lanier had the following exchange:

Q      If an individual had the following limitations.  Could sit
       for 30, stand for 30 minutes I'm referring to here, and
       would require periodically say with a frequency of an hour-
       and-a-half or two hours to lay [sic] down for 30 minutes.
       This hypothetical individual could walk two blocks at a
       time before they would have to stop and rest.  They are,
       they would be unable to bend, and unable to squat to
       perform those postural limitations, and would be limited
       to a 10 pound occasional frequent lift.  Would there be
       any work such an individual could do?

A      No, sir.

Tr. at 706.

On February 22, 2008, the ALJ issued a written decision denying

Plaintiff's claim.  Tr. at 10-20.  The ALJ outlined the five-step sequential

analysis that he was required to use under Social Security regulations.  Tr.

at 14.  At step one, the ALJ found that Plaintiff had not engaged in SGA

since July 18, 2001.  The ALJ at step two found that Plaintiff had a severe

combination of impairments that was a history of degenerative disc disease

and depression.  However, the ALJ found that Plaintiff's impairments did

not meet or equal a Listing.  Tr. at 16.  The ALJ noted that Plaintiff's back

problems did not meet Listing 1.04 for Disorders of the Spine, and that his

mental impairments did not satisfy Listing 12.04 because he did not have

the Paragraph B or C criteria.  Specifically, the ALJ noted that Plaintiff's

depression did not markedly impair his activities of daily living, social functioning, or concentration, persistence, and pace, and that he had not suffered any period of decompensation.  <u>Tr.</u> at 16.  The ALJ found that Plaintiff had mild restrictions in activities of daily living and moderate difficulties in social functioning and with concentration, persistence, and pace.  <u>Tr.</u> at 16.

The ALJ found that Plaintiff had the RFC to perform light work except that he could only occasionally perform postural maneuvers, and could not climb ladders, ropes, or scaffolds.  <u>Tr.</u> at 16.  The ALJ limited Plaintiff to moderately complex or detailed tasks and occasional contact with the public, co-workers, and supervisors.  The ALJ noted Plaintiff's education and work history as an industrial truck operator, construction worker, landscape gardener, hand packager, and fertilizer mixer.  <u>Tr.</u> at 17.  The ALJ went through Plaintiff's history of back pain and his regimen of medications, noting that Plantiff experienced dizziness and drowsiness as side effects. The ALJ stated that Plaintiff could not bend regularly, and was limited to lifting ten pounds.  Plaintiff needed to lie down frequently, and steroid injections had not helped alleviate his pain.  The ALJ indicated that Plaintiff's neck pain caused his arms to go numb at times, and that other

treatment options, like the spinal stimulator and physical therapy, had done nothing to lessen the pain. <u>Tr.</u> at 17. The ALJ reviewed Plaintiff's history of depression and suicidal ideation.

The ALJ also went through Plaintiff's medical history, indicating the lack of success that Plaintiff had with treatment. <u>Tr.</u> at 18. However, the ALJ noted that an MRI of Plaintiff's lumbar spine did not show disc hernation or spinal stenosis, and that another MRI scan showed little pathology. <u>Tr.</u> at 18. The ALJ pointed out Dr. Fortin's finding that little objective evidence supported Plaintiff's descriptions of pain, beyond the lumbar paraspinal muscle spasms. <u>Tr.</u> at 18. However, the ALJ did consider Dr. Robert's statement that Plaintiff was disabled and that restrictions on his ability to perform basic tasks would impact Plaintiff's employability.

The ALJ referenced Social Security Ruling 96-7p and 20 C.F.R. §§ 404.1529 and 416.929, which required him to consider the medically determinable impairments using listed criteria. The ALJ stated that "there is a definite discrepancy between the claimant's alleged symptoms and the paucity of objective findings, especially those of the lumbar spine." <u>Tr.</u> at 18. The ALJ wrote that Plaintiff had not had hospitalizations for pain, and that Dr. Narla and Dr. Fortin were "at a loss" to explain Plaintiff's

symptoms. <u>Tr.</u> at 18. Dr. Robert's opinion that Plaintiff might not be employable was rejected because he did not "specifically indicate what physical findings" supported his opinions, and did not specify restrictions on Plaintiff's abilities. <u>Tr.</u> at 18. The ALJ determined that Plaintiff was not totally credible because the objective medical evidence did not support his subjective descriptions of pain. <u>Tr.</u> at 19. Furthermore, although Plaintiff said he could only go an hour and a half without lying down, he rode in the car an hour to the hearing, waited for the hearing to begin, and then went through the whole hearing without lying down.

With respect to Plaintiff's depression, the ALJ recognized Plaintiff's suicidal ideation, but noted that there was no medical or record evidence of a suicide attempt or hospitalization due to depression. <u>Tr.</u> at 19. The ALJ took into consideration Dr. Kujoth's finding that Plaintiff's ability to concentrate was limited by his pain. However, he noted that any limitations that Plaintiff had were only mild or moderate, as opposed to marked. <u>Tr.</u> at 19. Further, the ALJ indicated that Plaintiff's concentration deficit was due to his physical, not his psychological, condition. The ALJ ultimately determined that the record evidence did not show anything beyond a moderate limitation in concentration due to depression, and noted that

there was no evidence of decompensation.  <u>Tr.</u> at 19-20.

With respect to Plaintiff's RFC, the ALJ found Plaintiff could lift ten pounds frequently and not more than twenty pounds maximum; perform only occasional postural maneuvers; not climb ladders, ropes, or scaffolds; perform only moderately detailed or complex tasks; and have occasional interaction with supervisors, co-workers, and the public.  <u>Tr.</u> at 20.  Given this RFC, Plaintiff could perform his past work as a fertilizer mixer.  The ALJ found that even if Plaintiff was limited to sedentary work, though, Plaintiff could perform the job of surveillance system monitor, ampoule sealer, or lens glass assembler, as Dr. Lanier had testified.  <u>Tr.</u> at 20.  Accordingly, Plaintiff was not disabled for Social Security purposes.

Plaintiff appealed, but the Appeals Council denied his request for review on May 29, 2009.  <u>Tr.</u> at 5.  Plaintiff filed this suit on July 21, 2009.

ANALYSIS

Plaintiff presents six arguments for reversal.  With the standards articulated above in mind, the Court addresses each of Plaintiff's arguments in turn.

## I.   <u>MEDICAL EVIDENCE MISSTATED</u>

Plaintiff first argues that the ALJ ignored objective medical evidence

that showed the extent of Plaintiff's back injuries.

In making a disability determination, an ALJ must take into consideration all symptoms, "including pain, and the extent to which [the plaintiff's] symptoms can be reasonably accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(a). The ALJ need not evaluate all evidence, but must weigh the important evidence so that the Court can trace his reasoning. Stephens, 766 F.2d at 287.

In this case, Plaintiff is correct that the ALJ was mistaken in his finding that Plaintiff had not been hospitalized for back pain. See, e.g., Tr. at 601, 604. Nonetheless, the ALJ's overall decision was supported by substantial evidence. The ALJ considered Plaintiff's symptoms and noted that medication, physical therapy, steroid injections, and the spinal stimulator did not help alleviate Plaintiff's pain. The ALJ also observed that Plaintiff's doctors were at a loss on how to treat him, and noted Dr. Fortin's finding that Planitiff's symptoms were supported by a "paucity of objective findings . . . other than lumbar paraspinal muscle spasms." Tr. at 188. While a 2001 MRI showed spondylolisthesis, a more recent MRI from 2004 showed no disc herniation, no spinal stenosis, and no enhancing pathology.

<u>Tr.</u> at 172, 179.

In short, the ALJ's conclusion that Plaintiff's back pain did not rise to the level of disability was supported by substantial evidence.  Plaintiff in effect asks the Court to re-weigh the evidence, which is improper at this stage of review.  The Court will not disturb the ALJ's findings in this respect.

II.   <u>FAILURE TO CONSIDER EFFECTS OF MEDICATION</u>

Plaintiff's second argument is that the ALJ failed to discuss how the side effects from his medication would impact his employability.

Social Security Regulations require an ALJ to consider the "type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms."  SSR 96-7p.  Although "the effects of medication alone would not support a disability finding, [an] ALJ's failure to consider such testimony, in conjunction with other evidence, is error."  <u>McKenzie v. Heckler</u>, 589 F. Supp. 1152, 1158 (N.D. Ill. 1984).

Contrary to Plaintiff's assertion, the ALJ did consider the side effects of his medication in the decision.  The ALJ noted that drowsiness and dizziness were side effects of Plaintiff's medications.  <u>Tr.</u> at 17.  However, the   ALJ   pointed out   that "[a]lthough the claimant attempted to

emphasize that his pain medication[s] cause him difficulty with concentration and attention, the consultative psychologist did not preclude work activity." Tr. at 19.  The ALJ also pointed out that Plaintiff was able to drive a car, a task that required concentration and attention.  Tr. at 19-20.  The ALJ ultimately concluded that, despite the side effects from Plaintiff's medication, Plaintiff had the ability to work.

Substantial evidence supports the ALJ's decision regarding Plaintiff's ability to concentrate despite side effects from medication, and the Court will not reverse the decision.

III.   ERRONEOUS CREDIBILITY DETERMINATION

Third, Plaintiff argues that the ALJ's assessment of his credibility was erroneous because the ALJ used the "sit and squirm" test.

As the U.S. Court of Appeals for the Seventh Circuit noted, "[a]pplicants for disability benefits have an incentive to exaggerate their symptoms, and an [ALJ] is free to discount the applicant's testimony on the basis of the other evidence in the case." Johnson v. Barnhart, 449 F.3d 804, 805 (7th Cir. 2006).  An ALJ's credibility determination can be reversed on judicial review only when it is wholly without support in the record and is thus "patently wrong."  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir.

2008) (internal quotation marks omitted).

In this case, the Court will not disturb the ALJ's credibility finding because the ALJ explained that the objective medical evidence in the record did not support Plaintiff's descriptions of his symptoms.  For example, Dr. Fortin noted a lack of objective medical findings supporting Plaintiff's descriptions of pain.   Another doctor noted that Plaintiff engaged in exaggerated pain behaviors.  The ALJ's credibility determination was not solely based on his observations of Plaintiff during the hearing, although the ALJ indicated that Plaintiff's posture and maneuvers during the hearing were inconsistent with his subjective descriptions of pain and his physical limitations.  <u>Tr.</u> at 19.  While the U.S. Court of Appeals for the Seventh Circuit has expressed discomfort with the "sit and squirm" test, it has "repeatedly endorsed the role of observation in determining credibility . . . ."  <u>Powers</u>, 207 F. 3d at 436.  Here, the ALJ's observations, in conjunction with record evidence, led him to the conclusion that Plaintiff was not entirely credible.  <u>See</u> <u>Powers</u>, 207 F.3d at 436 (upholding hearing officer's credibility determination when the officer's observations were "one of several factors that contributed" to the determination).

In short, the ALJ's credibility determination had support in the record

and was not "patently wrong."  Accordingly, the Court denies Plaintiff's request for reversal on this basis.

IV.   <u>REJECTION OF TREATING PHYSICIAN'S OPINION</u>

Plaintiff next argues that the ALJ erred by not giving Dr. Robert's opinion that Plaintiff was disabled controlling weight.

Under Social Security Regulations, a treating source's opinion is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record . . . ." 20 C.F.R. § 404.1527(d)(2).  The ALJ considers the length of the treating relationship, the extent of the treating relationship, whether the treating source's opinion is supported by medical evidence, and whether the treating source's opinion is consistent with the entire record.   20 C.F.R. § 404.1527(d)(2).

In this case, substantial evidence supports the ALJ's decision not to give controlling weight to Dr. Robert's opinion that Plaintiff was "medically disabled . . . ."  <u>Tr.</u> at 558.  First, a finding of disability is reserved to the SSA, and the opinion of a medical professional on this issue is not given "any special significance . . . ." 20 C.F.R. § 416.927(e)(3).  Second, the ALJ

explained that he did not adopt Dr. Robert's finding because, although Dr. Robert indicated that Plaintiff would have "stringent physical restrictions" on employment, he did not specify what those restrictions would be.  Tr. at 18, 558.  Finally, other more recent objective medical evidence in the record supports the ALJ's decision not to give Dr. Robert controlling weight.  For example, in 2005, two years after Dr. Robert opined that Plaintiff was disabled, Dr. Panepinto assessed Plaintiff's abilities and found that he was only mildly or moderately restricted in terms of his physical abilities.  Tr. at 384-88.

The ALJ's decision not to give controlling weight to Dr. Robert is supported by substantial evidence, and the Court will not disturb it.

V.   FAILURE TO FOLLOW 20 C.F.R. § 404.1520a

Plaintiff contends that the ALJ failed to follow the procedures specified in the Regulations' special technique for evaluating mental illnesses at step three of his evaluation.

Social Security Regulations require an ALJ to assess the functional limitations of a claimant with mental impairments.   20 C.F.R. § 404.1520a(b).  An ALJ must evaluate a claimant's functional limitations in four areas: (1) activities of daily living; (2) social functioning; (3)

concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The Listings of Impairments assist the ALJ in evaluating a claimant's functional limitations, and the ALJ must discuss the findings in his opinion. 20 C.F.R. § 404.1520a(e)(2).

Here, the ALJ went through each of the four broad functional areas, determining that Plaintiff's limitations were only mild or moderate. The ALJ noted that Plaintiff had experienced no periods of decompensation. Furthermore, the ALJ relied on Dr. Hudspeth's finding that Plaintiff's mental impairments did not satisfy Listing 12.04 because he only had mild restrictions in terms of activities of daily living and social functioning, and moderate difficulties maintaining concentration, persistence, or pace. <u>Tr.</u> at 19, 401. Furthermore, more recent treatment notes from Dr. Hughes indicate that Plaintiff's mental condition was improving, and that his symptoms had been downgraded from severe to moderate. <u>Tr.</u> at 565, 567-68, 571-72, 614).

Substantial evidence supports the ALJ's functional limitations analysis, and therefore the Court will not reverse the SSA's determination on this ground.

VI.   <u>IMPROPER HYPOTHETICAL TO VOCATIONAL EXPERT</u>

Finally, Plaintiff argues that the ALJ posed a flawed hypothetical to the vocational expert, Dr. Lanier, because the ALJ did not take into consideration Plaintiff's statement that he needed to lie down for thirty minutes every hour and a half or so, and because he did not consider Plaintiff's limitations regarding his ability to concentrate.

When an ALJ poses a hypothetical question to a vocational expert, that question "must include all limitations supported by medical evidence in the record." Young v. Barnhart, 362 F.3d 995, 1003 (7th Cir. 2004). A hypothetical question is "fundamentally flawed" if it "is limited to the facts presented in the question and does not include all of the limitations supported by the medical evidence in the record . . . ." Id. at 1005.

Here, Plaintiff's argument has no merit. As discussed above, the ALJ did not include the lying down limitation in the hypothetical to Dr. Lanier because the ALJ found that Plaintiff's statement about lying down was not credible, and was not supported by the objective medical evidence in the record. Tr. at 19. With respect to Plaintiff's concentration limitations, the ALJ recognized that Plaintiff's abilities were moderately impacted by referencing Dr. Kujoth's conclusion that Plaintiff would have difficulty concentrating for more than five hours at a time. Tr. at 19. However, the

ALJ ultimately rejected this analysis because other evidence in the record, including an evaluation by a state agency doctor, demonstrated that Plaintiff was capable of concentrating on simple one and two-step tasks. The ALJ also noted that Plaintiff was capable of driving, which required concentration.  <u>Tr.</u> at 20.  Substantial evidence from the medical record supports the ALJ's hypothetical question to Dr. Lanier.

Plaintiff also argues that the ALJ ignored Dr. Lanier's testimony that an individual who missed work more than four days per month would not be employable.  While this was Dr. Lanier's testimony, he also testified that Plaintiff was capable of performing past work and other jobs in the economy.  The ALJ did not take into account the absenteeism testimony because the other objective medical evidence in the record did not indicate that Plaintiff would, in fact, miss four or more days of work per month. Substantial evidence supports the ALJ's decision in this respect, and the Court will not reverse on this ground.

<u>CONCLUSION</u>

THEREFORE, Plaintiff's Brief in Support of Complaint (d/e 11), which the Court has construed as a motion for summary judgment, is DENIED.  The Commissioner's Motion for Summary Affirmance (d/e 14)

is GRANTED, and the Commissioner's decision is AFFIRMED.  All pending

motions are DENIED as MOOT.  This case is closed.

ENTER:    August 16,  2010.

FOR THE COURT:

_____s/ Charles H. Evans_____
CHARLES H. EVANS
UNITED STATES MAGISTRATE JUDGE